UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
FRANCES CICOGNA,                              :
                                              :
                    Plaintiff,                :        **COMPLAINT**
          -against-                           :
                                              :        **JURY TRIAL**
CANON U.S.A., Inc.                            :        **DEMANDED**
                                              :
                    Defendant.                :
-------------------------------------------------------------X

Plaintiff Frances Cicogna ("Plaintiff"), by her attorneys, Berke-Weiss Law PLLC,

complaining of Defendant Canon U.S.A., Inc. ("Defendant" or "Canon"), alleges:

**PRELIMINARY STATEMENT**

1.      Plaintiff is a fifty-two (52) year old seasoned printing industry executive,

who is married with one child. She has enjoyed a successful 20-plus-year career, and

has been accorded accolades by the printing industry. But, her career came to a

screeching halt when Brian Dollard became her supervisor at Canon, and he sought

sexual favors from her by manipulating the terms and conditions of her employment to

his advantage. Dollard threatened and isolated Plaintiff from her colleagues, and made

it clear he would penalize her if she went to Human Resources. Only after Plaintiff, then

suffering from depression and post-traumatic stress disorder ("PTSD"), took a medical

leave of absence, did she feel able to report the sexual harassment to Canon. Canon's

HR department ignored this #MeToo moment, and performed a slow, inadequate, and

retaliatory investigation into Plaintiff's claims, causing Plaintiff further emotional

distress. Plaintiff's career in the shrinking printing industry has been effectively ended

by the harassment and retaliation she suffered at Canon, while her harasser has moved

on to enjoy another Director position with Canon's competitor.

## NATURE OF THE ACTION

2.      This action is brought to remedy discrimination on the basis of gender, *quid pro quo* sexual harassment, hostile work environment, and retaliation in the terms, conditions, and privileges of employment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"); the New York State Human Rights Law, New York Exec. Law § 290, *et seq.* ("NYSHRL"); and, the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101, *et seq.*

3.      Plaintiff was subjected to unlawful discrimination at work because of her gender; as a result, Plaintiff suffered severe emotional harm, received a diagnosis of PTSD and depression, and was approved for short term disability leave.

4.      Once Plaintiff was safely out of the workplace on medical leave, she filed a complaint with Canon through her attorneys. Plaintiff's attorneys sent a letter and draft EEOC Charge of Discrimination to the Chairman and CEO of Canon via FedEx on November 21, 2016 (the "Draft Charge"). The Draft Charge was sworn to by Plaintiff who later submitted an updated version to the Equal Employment Opportunity Commission ("EEOC").

5.      Plaintiff's complaint to Canon led to an inadequate and retaliatory investigation, which impeded her ability to return to work at Canon and, ultimately she was constructively discharged from Canon.

6.      Plaintiff was subjected to unlawful retaliation for bringing her claim to the attention of Defendant.

7.      Defendant's conduct was knowing, malicious, willful and wanton, and/or showed a reckless disregard for Plaintiff, which has caused and continues to cause Plaintiff to suffer substantial damages, including permanent harm to her professional and personal reputations, and severe mental anguish and emotional distress.

**JURISDICTION AND VENUE**

8.       This Court has jurisdiction over Plaintiff's Title VII claims pursuant to 28 U.S.C. §§ 1331.  The Court has supplementary jurisdiction over the claims brought under the NYSHRL, and the NYCHRL pursuant to 28 U.S.C. §§ 1332 and 1367.

9.       Venue is proper within this district pursuant to 28 U.S.C. § 1391(b)(1) because Plaintiff Frances Cicogna resides in this District, and Canon resides in New York State. Canon is located in Suffolk County and has offices in New York, New York.

10.       Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission on March 13**,** 2017, alleging discrimination on the basis of sex.  Plaintiff received a Dismissal and Notice of Rights, which was mailed on December 21, 2017, and is attached hereto as Exhibit A.

11.       Because of the NYCHRL claim, a copy of this Complaint has been filed with the New York City Human Rights Commission and New York City Corporation Counsel.

**PARTIES**

12.       Plaintiff Frances Cicogna resides in Westchester County, New York.

13.       Plaintiff was employed by Canon beginning in or about June 2010.  She worked in Canon's Business Imaging Solutions Group, focusing on commercial and in-plant printing.

14.       Plaintiff has not been paid by Canon since her short term disability payments ended on or about April 21, 2017, at or about which time Canon placed Plaintiff on an unpaid leave.

15.       On or about February 28, 2018, Plaintiff was deemed to have abandoned her position by Canon, which ended the purported leave of absence.

3

16.     At all relevant times, Plaintiff met the definition of an "employee" under all applicable statutes.

17.     Defendant Canon, whose parent, Canon, is a Fortune 500 company, is a leading provider of consumer, business-to-business, and industrial digital imaging solutions to the United States and to Latin America and the Caribbean (excluding Mexico) markets.

18.     Canon is incorporated in New York State.

19.     Upon information and belief, Canon's corporate headquarters are in Melville, New York. Canon had approximately 2,497 employees as of June 2015.

20.     Upon information and belief, Canon also wholly owns a subsidiary, Canon Solutions America, with offices in New York City.

21.     During the time Plaintiff worked at Canon, until she went out on disability leave in or about October 2016, Plaintiff occasionally worked from the Canon Solutions America office at 125 Park Avenue, New York, NY 10017, and also attended work-related classes, events, and meetings in New York City.

22.     At all relevant times, Defendant has met the definition of an "employer" under all applicable statutes.

**FACTS**

**PLAINTIFF WAS A SUCCESSFUL MARKETER
AND CANON EMPLOYEE**

**Plaintiff Is a Well-Respected Professional in Her Industry**

23.     In a shrinking printing industry, Plaintiff has enjoyed a long successful career, having worked in the field for twenty-four (24) years, including eighteen (18) before being recruited by a former colleague to join Canon.

24.     Plaintiff's work required her to travel often, she planned and attended trade shows and industry events across the country and internationally, and worked alongside colleagues from the few remaining companies offering similar products and services.

25.     Plaintiff's work earned her the respect of the small community of professionals in the field, in which she enjoys an excellent reputation.

26.     Plaintiff was invited to speak at events as an industry expert on such topics as migration to digital printing technology and the state of the printing industry.

27.     From 2012 to 2015, Plaintiff served as Vice-Chair of PRIMIR, the Print Industries Market Information and Research Organization. PRIMIR is the research unit of NPES, the Association for Suppliers of Printing, Publishing and Converting Technologies, a trade association for companies which manufacture and distribute equipment, systems, software, supplies used in printing, publishing and converting.

28.     In January 2016, Plaintiff was elected Chair of PRIMIR by its members.

29.     In September 2016, Plaintiff was inducted into the prestigious Soderstrom Society of the National Association of Printing Leadership. The Society describes itself as "an honors recognition organization for print, mail, and fulfillment leaders. The society is an asset to our industry as it brings together and honors industry professionals who have made outstanding contributions to the development and progress of our industry."

**Plaintiff's Role at Canon**

30.     Plaintiff started at Canon as a Manager in the BISG Production Systems Product Marketing team in or about June 2010.

31.     Plaintiff traveled extensively to industry events across the country and internationally, meeting with current clients and marketing Canon products to potential clients.

32.     Plaintiff's travel included regular meetings with clients and potential clients in New York City.

33.     In or about 2013, Plaintiff started reporting to Brian Dollard ("Dollard").

34.     Dollard was a Director when Plaintiff started reporting to him, and on information and belief he held that title throughout his employment by Canon.

35.     At the end of 2013, Dollard informed Plaintiff that she was being was removed from her management role, and was made an Advisor for the BISG Production Systems Go-To Marketing ("Advisor") team.

36.     At that time, Dollard told Plaintiff over the telephone that she was not "successful" in her former role and he would "make her successful," even though she was aware of no specific concerns about her performance.

37.     As an Advisor, Plaintiff reported to Dollard and Bob Barbera ("Barbera").

38.     In or about January 2016, Plaintiff was promoted to the position of Manager of Business Development and Segment Marketing, a position she held until she went out on medical leave in October 2016.

39.     As a Manager, she took on some additional responsibility of the in-plant business, and hired and managed a more junior employee, in addition to her previous duties.

40.     In her role as Manager of Business Development and Segment Marketing, Plaintiff reported solely to Dollard.

6

## DOLLARD CONTROLLED PLAINTIFF'S
## WORK ENVIRONMENT AND JOB PROSPECTS

41.      From 2013 on, Plaintiff's work environment and opportunities for advancement within Canon were controlled by Dollard, who required Plaintiff to run most decisions past him, including: who to include in meetings; whether to request assistance from other teams at Canon; and, even what client gift to bring to marketing events. If Plaintiff did not run decisions past Dollard, she risked being publicly reprimanded by him.

42.      Canon policies also required that Plaintiff get all of her travel plans approved by Dollard to obtain reimbursement when she reported solely to him; and, as a result, Dollard had knowledge of all Plaintiff's travel plans during that time.

43.      Canon also had a policy which required Plaintiff to inform her supervisor (Dollard) before applying to any other position within the company.

44.      In May 2015, pursuant to this policy, Plaintiff told Dollard about her application for a position at Océ, a Canon subsidiary located in Venlo, the Netherlands. Dollard had previously worked for Océ out of the Boca Raton, Florida office.

45.      Upon information and belief, Canon later changed this policy, so employees no longer needed to inform their supervisor before applying for another position within Canon.

46.      During the relevant time period, and as a matter of general practice and policy, Canon supervisors completed annual performance goal setting and reviews for their subordinates.

47.      In 2013, contrary to Canon's policy, Dollard did not provide Plaintiff with any goals at the beginning of the year, and provided her with a performance review. Consequently, Dollard's performance review of Plaintiff for 2013 was based upon

standards Dollard applied without having provided them to Plaintiff at the beginning of the year.

48.    On January 1, 2014, Plaintiff lost her management role, and became an Advisor for the BISG Production Systems Go-To Marketing team.

49.    As an Advisor, Plaintiff began reporting to Barbera, as well as Dollard.

50.    In 2014 and 2015, while Plaintiff reported to Barbera and Dollard, annual performance goals were set for her, and she was highly rated, achieving ratings of 5 out of 5, and 4 out of 5, respectively.

51.    Although Barbera was responsible for Plaintiff's performance reviews in 2014 and 2015, Dollard appeared to take credit for these highly-rated reviews, informing Plaintiff that he had directed Barbera to give her good performance reviews, since employees need to have high ratings to receive a promotion and to get the highest raise possible.

52.    Dollard also told Plaintiff that it was his decision to give her a 5 one year, and then a 4 the next, stating that it would appear suspicious to get 5s two years in a row, despite her consistently strong performance, making it clear that he had total control over her rating notwithstanding her actual accomplishments.

53.    In 2016, when Plaintiff was reporting solely to Dollard, she did not receive a review or any performance goals, which she believes directly affected her compensation.

54.    Upon information and belief, Canon paid one bonus in December and one in April, with one being merit based, and the other relating to profit sharing.

55.    Plaintiff did not receive any raise or bonus in December 2016 or April 2017, while she was on disability leave.

56.     Upon information and belief, any raise or bonus awarded in December 2016 or April 2017, would have been based on Plaintiff's performance in 2016, during which time she was actively working until the end of October 2016.

## WHEN DOLLARD BECAME PLAINTIFF'S MANAGER, SHE BEGAN TO SUFFER ADVERSE ACTIONS AT WORK

57.     Almost immediately after Plaintiff began reporting to Dollard in 2013, she began suffering adverse actions at work.

58.     In January 2014, despite being told by Dollard that she had been performing well, Plaintiff was removed as a manager.  Plaintiff's salary did not change, but the responsibility for supervising three staff members was taken from her, and she was moved from a manager's high-sided cubicle located near the other managers, to a smaller cubicle in another part of the office where there were no managers.  The move was viewed as a demotion.

59.     Another female employee, Jennifer Kolloczek, took over Plaintiff's supervisory duties and sat in her old cubicle.

60.     Dollard conveyed to Plaintiff that he made or approved the decision to remove her as a manager.

61.     Dollard regularly said directly to Plaintiff and in public meetings that Kolloczek "makes my knees knock."

62.     Dollard had informed Plaintiff that bringing in Kolloczek to take over Plaintiff's role had been his decision, and in May 2015, around the time he first made physical advances toward Plaintiff, Dollard disclosed that he had been involved in a sexual relationship with Kolloczek at an unspecified time in the past.

63.     In or about late August/early September 2015, after Dollard had started making unwelcome and unwanted sexual advances, he began telling Plaintiff that he was trying to make her a manager again.

64.     In or about November or December 2015, Dollard informed Plaintiff that she would be promoted back to a manager position in January 2016.

65.     On January 1, 2016, Plaintiff was promoted back to a management position, and her reporting structure changed so she reported solely to Dollard.

66.     Dollard told Plaintiff that he was responsible for the promotion, and based on everything he had told her, and his supervisory position, Plaintiff believed him.

67.     In or about February 2016, Plaintiff became increasingly concerned that Dollard had sole control over her position since while reporting only to him, he continued both to remind her that he was responsible for her promotion to manager and to make unwanted sexual advances.

68.     At the same time, Plaintiff began creating monthly reports of her activities, sending them to Dollard and his supervisor, Terry Akiba ("Akiba"), to make sure that Dollard was not the only manager who knew about her accomplishments.

69.     In or around March 2016, Akiba asked Plaintiff also to copy his boss, Hiro Imamura ("Imamura"), on her reports.

70.     After sending the March or April 2016 report to Dollard, Akiba, and Imamura, Dollard reprimanded Plaintiff, demanding that she share everything in her monthly reports with him first, so that he could add "context." Plaintiff viewed this instruction as another means of controlling her communications with and isolating her from other Canon management, so Dollard could maintain virtually complete control over her at work while continuing to prey on her sexually.

71.     In or about March or April 2016, Dollard informed Plaintiff that he had
learned that another employee had filed a complaint with Human Resources about the
Franchise Field program Dollard was implementing. Dollard told Plaintiff that he was
actively trying to find out who made the complaint, and when he learned who it was,
he would make it "very uncomfortable" for that employee.  Plaintiff took this as a
warning to her not to complain to Human Resources about Dollard, or she would suffer
adverse consequences.

### DOLLARD SEXUALLY HARASSED PLAINTIFF AND COERCED HER INTO UNWANTED AND UNWELCOME SEXUAL CONDUCT

72.     Plaintiff's position at Canon required her to travel extensively for
business, taking approximately thirty-five (35) business trips in 2015.  Dollard made it
clear that he expected his staff to have dinner and socialize with him outside of the
office, especially on business trips.

73.     Dollard repeatedly told Plaintiff that coordinating side trips with bosses in
conjunction with business travel was how he had been successful in his career, and he
expected her to take side trips with him.

74.     On May 6, 2015, Plaintiff's team had an overnight business trip to Salem,
Massachusetts, near Dollard's home, to brainstorm and share a group dinner. Dollard
asked Plaintiff to come up to the meeting on May 5, 2015, a day early, to have dinner
with him, and stay through May 7.

75.     During their dinner on the evening of May 5, 2015, Plaintiff asked
Dollard's advice about the position she was applying for at Océ.

76.     Having informed Dollard of the application under Canon policy as her
supervisor, Dollard insisted that Plaintiff did not have the necessary knowledge of the

materials involved in the Océ position, and he offered to help her learn the inkjet market to make her a competitive applicant.

77.     Dollard assured Plaintiff that he knew the people at Océ in charge of hiring, and that with his input she would surely get the job.

78.     On May 5, 2015, Dollard proceeded to take Plaintiff bar hopping around Salem, traveling by car and foot to approximately four different bars.  Later that night, at a bar he had brought her to, Dollard told Plaintiff he had feelings for her and out of the blue he kissed her for the first time, without her consent.

79.     At the bar, Dollard confessed to Plaintiff that on their previous business trip, he had waited outside her hotel room and debated knocking on her door.  Plaintiff was frightened by this confession and asked Dollard how he knew her room number. Dollard told her that he convinced the front desk to give him her room number, which made Plaintiff feel she was being stalked by him.

80.     Then, Dollard drove Plaintiff back to her hotel and suggested a night cap. Dollard was intimidating and she felt unable to refuse her boss's invitation, particularly with the Océ application pending.

81.     While at the hotel bar, Dollard took his campaign of sexual intimidation further, saying he wanted to go to her room to cuddle, suggesting that she would not have to "do anything."  Again, Plaintiff felt she could not refuse her boss's advances without jeopardizing her application for the Océ position, or suffering some negative consequence in her current position.  Dollard, at over six feet tall and stout, was physically intimidating to Plaintiff, who is five foot two and weighs one hundred and twenty pounds.

82.     Dollard came into Plaintiff's room where they kissed until he left later that night.

12

83.     During a business trip to Las Vegas the following week, Plaintiff was preparing for two video Skype interviews for the Océ position, to take place at 6AM local time on May 12 and 13, 2015.

84.     Dollard was aware of the timing of the Océ interviews, and on the evening of May 11, 2015, insisted that Plaintiff needed his help to learn about the inkjet market in order to be successful, and suggested they prepare in his hotel room.

85.     She went to his hotel room to prepare, and they briefly discussed the interview before Dollard stated that Plaintiff understood everything she needed for it and he asked her to undress and get into bed with him.  Although Plaintiff protested, he suggested she stay and cuddle with him.  Plaintiff still had no interest in having any physical contact with Dollard, but felt she could not leave without jeopardizing her application for the Océ position, and her job, so she got under the covers with him in her underwear.

86.     Once they were under the covers, Dollard insisted on taking things further.  After touching her body and confirming that she still was wearing her underwear, Dollard told Plaintiff to remove her underpants, which she did despite feeling very uncomfortable.

87.     He apparently expected Plaintiff to stay with him all night, but she left the room as soon as she believed he was sleeping and would not object to her leaving.

88.     A few weeks after her May 12, 2015 interview, Plaintiff was told by the Hiring Manager that the position had been upgraded to a Director position, and Plaintiff could not be hired by Océ.

89.     After the Océ interview, Plaintiff had breakfast with Dollard at the California Pizza Kitchen in the Las Vegas airport, where she told him that she wanted their relationship to be professional, not sexual, and to her relief, Dollard agreed.

13

90.     Although Plaintiff believed that Dollard had agreed to maintain a professional relationship with her, instead, he continued to make inappropriate sexual comments and advances to Plaintiff.

91.     Plaintiff rebuffed Dollard's advances on numerous business trips, including on: May 19, 2015; June 4, 2015; September 25, 2015; September 29, 2015; September 30, 2015, and October 1, 2015, but Dollard persisted in making unwelcome comments and advances to Plaintiff.

92.     For example, on or about June 4, 2015, while meeting with a client off-site, Dollard wrote notes about "little Brian," referring to his penis, and his needs, and showed the notes to Plaintiff during their meeting with the owner of the client company.

93.     On or about October 26-29, 2015, Plaintiff attended the PRIMIR Conference in West Palm Beach, where she successfully lobbied the members to support her as 2016 Chair.  While socializing at the bar with other industry members, Dollard began aggressively pulling at her clothing to get her attention.

94.     On or about December 3, 2015, approximately one week after Dollard told Plaintiff that she would begin a new position as a manager in January 2016, he propositioned Plaintiff to go up to his hotel room, after a client dinner.

95.     Plaintiff had been able to successfully stave off a sexual encounter with Dollard for the prior six months, but this time he would not take no for an answer, telling Plaintiff she should trust him, since he made her a manager again, as he promised he would.

96.     Plaintiff could not resist his advances and she was coerced into entering his hotel room. Once there, Plaintiff remembers Dollard putting his arms around her

and falling onto the bed. She woke up the next morning completely naked, with no memory of how she undressed.  Plaintiff put on her clothes and quickly left the room.

97.     As Dollard promised, effective January 1, 2016, he restored Plaintiff to a management position, albeit one that reported solely to him.  Plaintiff's salary increased, but she was unable to ascertain whether the position paid more, or if the increase was attributable to a bonus to which she was entitled based on her performance evaluation for 2015.

98.     After Plaintiff was promoted, she felt increasingly trapped and unable to prevent Dollard's advances for fear of losing her management position and job.

99.     During a vendor conference on or about January 18-22, 2016, Dollard showed up at Plaintiff's hotel room late at night and insisted on being let in.  Because this occurred three weeks after Plaintiff started her new management position reporting only to Dollard, she again felt unable to refuse him entry into her room.

100.    On or about February 3-7, 2016, Plaintiff attended an AlphaGraphics Gold Circle event in Cabo, Mexico.  In 2015, Plaintiff had attended the conference alone and successfully built client relationships.  In 2016, Dollard insisted on attending the conference with Plaintiff, and he continued to force an unwelcome sexual relationship on her while they were together in Cabo.

101.    Thereafter, on every business trip Plaintiff took with Dollard from January 2016 through June 2016 – more than a dozen in all – Dollard made unwanted and unwelcome sexual demands of Plaintiff.  She acquiesced due to his extreme control over her position, his imposing stature, and his bullying nature.  Based on Dollard's claim that he had taken adverse action against employees who had complained about him to HR, going to HR was not an option for Plaintiff.

102.    On or about April 7-8, 2016, Plaintiff was at dinner with two male clients and Dollard, when he kept rubbing Plaintiff's leg under the table with his hand. Plaintiff felt disgusted and trapped, unable to leave the table and her clients without causing a scene.

103.    On or about May 26, 2016, Plaintiff was at dinner with industry colleagues – two males and one female – from outside Canon, and Dollard.  Again, Dollard rubbed Plaintiff's leg under the table with his hand, making her so upset that she had to excuse herself to go to the bathroom and cry.

104.    On or about September 27, 2016, while in a cab with Dollard going to meet customers for dinner on a business trip to Orlando, Dollard put his hand on Plaintiff's leg, moving it up her skirt.  Plaintiff pushed his hand away and told him not to do that. But, he would not stop groping Plaintiff, putting his hand down the top of her dress as well, before she was able to exit the cab.

105.    Dollard told Plaintiff repeatedly in or about September 2016, that he was trying to transfer from marketing to sales, and that he was working to ensure that she would replace him in his position so that, among other benefits he promised she would receive, the employees reporting to him would report to her, but this never happened.

### DOLLARD'S ACTIONS CREATED
### A HOSTILE WORK ENVIRONMENT AT CANON

106.    Plaintiff regularly was subject to intimidation, bullying and ridicule from Dollard.

107.    Dollard spoke regularly about his romantic and sexual interests.

108.    Dollard told Plaintiff about numerous younger women he had slept with, including another female Canon employee he had worked with in a different office.

109.    Dollard informed Plaintiff that a male field manager they worked with liked to hire prostitutes on business trips, and would claim "sketchy" expenses in his expense report.  Dollard claimed that he approved those expense reports despite having to do so "creatively."

110.    Dollard would frequently comment on Plaintiff's appearance, complimenting her on her clothing, or questioning her state of mind if she was not smiling.

111.    In the report from Canon's own Human Resources investigation ("HR Investigation Report") into Plaintiff's complaints, which Canon attached as an exhibit to their EEOC Statement of Position and attached hereto as Exhibit B, Jennifer Kolloczek "shared that Dollard had screamed at her ([Kolloczek]) in the past about work related matters and on one occasion made her cry."

112.    In or about July 2016, Dollard's behavior became more erratic and abusive to Plaintiff.

113.    Dollard regularly humiliated Plaintiff and other members of her department by yelling at them or chastising them in front of each other.  During one meeting in July 2016, Dollard singled out Plaintiff and verbally attacked her in front of their teams, accusing her of performing poorly on a project.  The project, due to be completed in September 2016, was ultimately successful, due largely to her efforts.

114.    In late July/early August 2016, Dollard escalated his humiliation of Plaintiff by yelling at her, telling her that she was no longer allowed to make decisions without his approval.  Dollard called Plaintiff multiple times in a single day to yell at her; later, Plaintiff learned that another colleague was in the room with Dollard when he made those harassing calls, a further humiliation.

115.    On or about September 7, 2016, Dollard invited Plaintiff for a drink after work, where he apologized for being so hard on her throughout the summer.

116.    Dollard proceeded to tell Plaintiff that he cared for and "loved" her, asking why she never told him she loved him, despite his saying it to her frequently. Plaintiff did not love Dollard, but was concerned that he was looking for reasons to fire her after spending two months yelling at and criticizing her repeatedly.

117.    Dollard continued to demand that Plaintiff say she loved him, telling her he needed to hear her say "it."  Under intense pressure, Plaintiff spoke the words "I love you."  Dollard then asked Plaintiff to expense the check.

118.    Dollard told Plaintiff that he liked embarrassing her and he often did.  For example, on or about September 24, 2016, when Plaintiff was being inducted into the prestigious Soderstrom Society, Dollard asked her, "did you primp?", and then he asked if she had "shaved down there."  These humiliating comments were made to Plaintiff right before she was due to receive a significant work-related honor, and made her red-faced.  Then Dollard said, as he often did when she reddened with embarrassment at his remarks, "Oh, I made you blush!"

119.    Dollard sent Plaintiff numerous inappropriate text messages from September 2015 through June 2016, attached hereto as Exhibit C, which demonstrate both Dollard's unwelcome behavior and Plaintiff's attempts at deflecting it.  For example, Dollard texted: "Want to dirty text [winky face emoji]." Plaintiff replied, "mud, rocks, sticks, stones."  Undeterred, Dollard said: "Huh…I had something else in mind."  Plaintiff again attempting to stave off unwanted advances from her boss, changed the subject, stating, "FYI. We just got our dinner approval for tonight." Dollard responded: "This still isn't what I had in mind.  Let's try the rhyme game.  I say I say [sic] Rex, you say _ex.  I say show me, you say __ow me."

120.     Dollard also sent Plaintiff text messages in December 2015, with sexually explicit pictures of a male action figure performing oral sex on a female action figure. *See* Exhibit C.

121.     Dollard told Plaintiff on numerous occasions that he "could be a lesbian" because he liked to "go down" on women.

122.     When speaking to Plaintiff by phone, Dollard often asked her what color her underwear was, or what she was wearing.  When she answered by stating, "I'm wearing a suit, as always," Dollard would complain that Plaintiff was "no fun."

### PLAINTIFF SUFFERED SEVERE EMOTIONAL DISTRESS DUE TO THE HARASSMENT AT WORK

123.     On October 25, 2016, Plaintiff went to her doctor to seek help because her anxiety was so bad that she had been unable to sleep.

124.     Plaintiff's doctor, whom she had seen for over ten years, expressed concern because of her extreme anxiety and exhaustion, and suggested that Plaintiff take a leave from her job, referring Plaintiff to a therapist.

125.     Plaintiff's therapist started seeing her weekly in November 2016 and diagnosed her with depression before referring her to another specialist who added an additional diagnosis of post-traumatic stress disorder.

126.     Plaintiff began receiving short-term disability payments from Canon on October 31, 2016, and was approved for payments for the maximum available short-term disability period.  The benefits ended on or about April 21, 2017.

### LACK OF SEXUAL HARASSMENT TRAINING AND POLICIES AT CANON

127.     During the more than three years she worked at Canon, Plaintiff has no recollection of being trained on how to recognize, prevent or report sexual harassment.

128.    In Respondent's Statement of Position, filed at the EEOC, Canon produced a record of the online trainings that Plaintiff purportedly completed, including two on Workplace Harassment in 2010, right when she started at the Company, and one on "Helplines and Non-Retaliation" in December 2014.

129.    The same training record indicates that Plaintiff completed trainings in Spanish, a language she does not speak fluently, cannot read, and was not required for her duties.  She has no recollection of being trained in Spanish by Canon.

130.    Plaintiff understood that Canon's Business Integrity/Compliance Hotline existed for employees to report fraud and abuse, not sexual harassment.

131.    Plaintiff was not aware of any explicit sexual harassment policy at Canon.

132.    Plaintiff did not have ready access to a copy of any sexual harassment policy from Canon; to the extent there was a sexual harassment policy, on information and belief, it was in a password protected system not easily available to Plaintiff or her colleagues.

**PLAINTIFF HAD A REASONABLE BELIEF THAT HUMAN RESOURCES WOULD NOT HELP STOP DOLLARD'S BEHAVIOR**

133.    Plaintiff did not recall receiving training on how Canon dealt with sexual harassment, including how to report sexual harassment at Canon.

134.    Despite traveling for business frequently, Plaintiff was not aware of any Canon policy governing acceptable behavior on business trips.

135.    Upon information and belief, another individual in Plaintiff's department, who was known to have angry outbursts, routinely brought a knife to work.  Plaintiff understood that Human Resources was made aware of that situation, having been told as much by two of her colleagues, and HR refused to act to protect the other employees from the weapon.

136.    In or about 2012, Plaintiff had reported her concerns about another Director's yelling outbursts to a Canon Senior Director, and understood that Human Resources had been informed about the complaint, but the male director continued to yell at Plaintiff and her team, and was promoted to another position.

137.    Dollard previously had demonstrated to Plaintiff that he could find out who made complaints to HR.

138.    Plaintiff had seen that Dollard was very vindictive towards employees he believed complained about him, and he made it clear that he had complete control over her employment.

139.    Dollard often remarked "I'm going to bury [him/her]" in regard to any employee he did not like.

140.    During her years at Canon, Plaintiff had been unable to get a response from HR for routine hiring needs, with the assigned HR representative once taking months to answer Plaintiff's phone calls and emails.

141.    In or about Fall 2016, Plaintiff was unaware of who her HR representative was, and believed that they changed often.

142.    Plaintiff's negative experiences with HR and Dollard's claims that he obtained confidential information from HR to the detriment of other employees, made her reluctant to reach out to HR to complain about Dollard in 2015 and 2016.

143.    Canon's HR Investigation Report, *see* Exhibit B, indicates that before going on leave, Plaintiff spoke with a colleague, Ms. Kolloczek, who sensed that Plaintiff was unhappy and " . . . encouraged her to talk to Mr. Akiba or to Human Resources but [Plaintiff] was reluctant to do so because she was afraid Mr. Dollard would find out."

144.    Upon information and belief, there is an increased understanding that women are generally afraid to report harassment to Human Resources, as evidenced by

the #MeToo and Time's Up movements. This parallels Plaintiff's experience at Canon, and is supported by HR's dismissive handling of her complaints about Dollard when they were brought to Canon's attention in November 2017.

## CANON DID NOT TAKE PLAINTIFF'S CLAIMS
## SERIOUSLY AND RETALIATED AGAINST HER

145.    Plaintiff reported Dollard's harassment to Canon via a FedEx letter from her attorneys on November 21, 2016. Plaintiff was too afraid, for the aforementioned reasons, to make a complaint without the assistance and protection of a lawyer.

146.    Canon's investigation was retaliatory because it demonstrated that Canon was trying to prove their apparent assumption that Plaintiff was lying, rather than conducting a thorough, unbiased investigation of her serious claims.

147.    Canon's investigation was conducted internally by HR, and consistently discredited the truth of Plaintiff's statements while crediting her harasser's statements, even in the face of irrefutable evidence to the contrary.

148.    Canon's investigation by HR moved unreasonably slowly to investigate Plaintiff's serious complaints of sexual harassment:

   a.    Canon did not acknowledge receipt of the document outlining her serious allegations of sexual assault, *quid pro quo* harassment, and a hostile work environment, until November 29, 2016, over a week after it was received, and even then, the initial response was sent via first class mail, although the complaint was sent by overnight mail and an email address was provided for a speedy response.

   b.    Plaintiff was available for an interview from the start, but Canon did not request an interview with Plaintiff until six weeks after receiving her

complaint.  The company explained this delay by stating that Plaintiff had provided them with so much detail they could not contact her earlier.

c.   According to Canon's HR Investigation Report, by the time Canon requested an interview with Plaintiff, HR had interviewed a number of employees, including: Dollard, twice; members of Plaintiff's carpool; Dollard's two male supervisors; the HR Business Partner who had processed the complaint brought by another employee about the Franchise Field Program; Kolloczek, the female employee who had replaced Plaintiff as a manager in 2014; and, another female colleague who rarely worked with Plaintiff, but Dollard had told Plaintiff he'd had a sexual relationship with.  *See* Exhibit B.

149.   Canon failed to interview colleagues who worked closely with Plaintiff and Dollard; instead, it interviewed employees who would not have knowledge of the harassment, while gratuitously informing those employees that there was a physical relationship between Plaintiff and Dollard, even though Plaintiff claimed she was being sexually harassed by Dollard.  Canon's mischaracterization of her complaint and disregard of the confidential nature of the inquiry added to the hostile work environment to which Plaintiff was subjected, and served to belittle Plaintiff in front of her colleagues who apparently had been unaware of Dollard's harassment of her until Canon disclosed it to them, by falsely implying that Plaintiff and Dollard had a "relationship" when that was false and contrary to the information Plaintiff provided to Canon.  *See* Exhibit B.

150.   Canon did not interview Barbera, Plaintiff's colleague who worked closely with her and Dollard, and had traveled with them.  *See* Exhibit B.

151.    Apparently, Canon did not interview employees who traveled regularly for business with Dollard and Plaintiff.  *See* Exhibit B.

152.    In the HR Investigation Report, Canon falsely claimed that Plaintiff " . . . alleged that the employees that she carpooled to work with would be able to corroborate her allegations."  *See* Exhibit B.

153.    In the Draft Charge she shared with Canon, Plaintiff alleged that she once dropped Dollard off at a hotel in White Plains with her carpool, and that she had a phone call with him while in the carpool using a headset.

154.    Plaintiff did not allege that her carpool mates would be able to corroborate whether Dollard harassed her on that call.

155.    According to the HR Investigation Report, Canon asked three of Plaintiff's male carpool mates if they were aware of "any physical relationship [Plaintiff had] with Mr. Dollard." *See* Exhibit B.

156.    As such, Canon unreasonably implied to Plaintiff's carpool mates that she had a physical relationship with Dollard, when Plaintiff had alleged that she was sexually harassed by him, not that she had engaged in a "relationship" with him.

157.    Upon information and belief, Canon could have investigated whether Plaintiff had discussed Dollard with her carpool mates, or whether they knew anything about her interactions with Dollard without making a false statement to them to the effect that Plaintiff and Dollard had a physical relationship.

158.    Plaintiff ultimately was interviewed by two members of Canon's Human Resources staff, Jami Schultz and Elina Wallis, on February 2, 2017, in the presence of her attorneys.

159.    The interview took place more than ten weeks after Canon received Plaintiff's detailed and disturbing complaint.

160.    The questioning on February 2, 2017 was hostile to Plaintiff.  Notably, Plaintiff was badgered and harassed by Schultz, who asked Plaintiff numerous times why she hadn't said "no" to Dollard, rather than asking her questions about the many occasions when Plaintiff made it clear that his advances were completely unwelcome.

161.    When Plaintiff was describing being physically assaulted by her boss in a cab in Orlando, Schultz asked: "You were able to push his hand away and say no, is that right?"

162.    Schultz's question ignored the fact that Plaintiff was describing an act of assault and battery being committed by her boss.

163.    Schultz's question ignored the fact that it was not Plaintiff's responsibility to push her boss's hand off her body while he was assaulting her.

164.    Canon's Human Resources representatives did not ask why Plaintiff was scared of Dollard, even though she told them she was frightened of him numerous times.

165.    Schultz badgered Plaintiff throughout the interview, using a demeaning and threatening tone.

166.    During the February interview, Schultz told Plaintiff that there had not been any complaint to Human Resources about Dollard, in an attempt to undermine Plaintiff's belief that Dollard could know about HR complaints, even though it appears that there had been at least one HR complaint implicating Dollard.

167.    Canon's HR Investigation Report, includes confirmation that an employee had made a call to Canon's helpline complaining about the Franchise Field program, as Plaintiff had asserted. *See* Exhibit B.

168.    Despite Canon's claims to the contrary, the investigation demonstrates that Dollard's threat to Plaintiff based on his claim of knowledge of a confidential HR

complaint implicating him was based on an actual complaint to HR, and that Dollard apparently had learned who made it.

169.     When Plaintiff described a business trip to Savannah in or about May 2016, where Dollard was supposed to leave a day before Plaintiff, Canon questioned Plaintiff's report that Dollard insisted Plaintiff agree to let him stay overnight in her hotel room, after he decided to stay in Savannah an extra day.

170.     Plaintiff explained that, after Dollard checked out of his hotel room, he informed Plaintiff that his other plans had been cancelled and he could stay in Savannah.  Dollard asked Plaintiff to stay in her room since he no longer had a room of his own at the hotel.

171.     At the interview, Schultz asked Plaintiff, "Why didn't you suggest that he extend his room?"

172.     When Plaintiff answered that Dollard had already checked out of the hotel, Schultz badgered her again: "he'd had a room before, why not suggest he extend it?"

173.     Based on Canon's own HR Investigation Report, at the time of this interview with Plaintiff, Canon had proof that "he [Dollard] did not submit receipts for a hotel for two nights at the end of his trip [to Savannah]."  *See* Exhibit B.

174.     According to the HR Investigation Report, Canon mischaracterized Plaintiff's claim, stating that "Mr. Dollard wanted to stay an extra day after their business was concluded."  In fact, Plaintiff had informed Canon that Dollard was supposed to leave Savannah before their official business ended, but his plans changed, so he stayed and used this as a pretext to stay in Plaintiff's hotel room for the rest of his stay. *See* Exhibit B.

175.     According to the HR Investigation Report, Dollard claimed that he had stayed with his daughter for the time period when Plaintiff alleged he stayed in her hotel room; however, Schultz did not ask Plaintiff about Dollard's assertion, denying Plaintiff an opportunity to respond to Dollard's false claim.  *See* <u>Exhibit B</u>.

176.     Canon's HR Investigation Report asserts, "Dollard subsequently confirmed that he did in fact visit his daughter on the dates in question."  But the report does not indicate how Dollard "confirmed" this other than by his own presumed self-serving statement.  *See* <u>Exhibit B</u>.

177.     After Canon's February interview of Plaintiff, it also became clear that Canon's investigation had not included a review of Dollard's cell phone, which was paid for and controlled by Canon.

178.     Canon's HR Investigation Report confirms that they did not review Dollard's cell phone.  *See* <u>Exhibit B</u>.

179.     Dollard's cell phone contained sexually inappropriate text messages to Plaintiff, which Plaintiff supplied to Canon after her interview.  *See* <u>Exhibit C</u>.

180.     In contrast, Canon requested that Plaintiff return her cell phone to the company multiple times, despite the fact that it was Plaintiff's personal cell phone, not paid for or provided by Canon.

181.     Canon's HR Investigation Report demonstrates that while the Company demanded Plaintiff present physical evidence of her harassment, they did not review Dollard's cell phone.  *See* <u>Exhibit B</u>.

182.     According to the HR Investigation Report, in Dollard's first interview with Human Resources, on December 1, 2016, he stated that there were no personal communications between him and Plaintiff.  *See* <u>Exhibit B</u>.

183.   According to the HR Investigation Report, even after Canon had possession of the text messages between Dollard and Plaintiff, HR again asked Dollard if he had sent Plaintiff text messages with any sexual connotation, and when they showed the messages to him on February 14, 2017, "he still denied sending them and said he would need to 'check the context' of the messages." *See* Exhibit B.

184.   Plaintiff had informed Canon that Dollard stayed at the Crowne Plaza in White Plains, instead of his usual hotel near the office, in January 2016.  When Dollard had demanded that Plaintiff drive him to and from the office in Melville, New York, because White Plains was on her way to work, and then had her pay for the hotel stay because he said he had lost his credit card.

185.   According to the HR Investigation Report, on January 12, 2017, Dollard claimed that "he would never have stayed at the Crowne Plaza in White Plains because he's 'a Marriott guy.'" *See* Exhibit B.

186.   HR representatives did not appear to question Dollard's assertion, despite the fact that Plaintiff had provided Canon with a receipt for Dollard's stay at the Crowne Plaza in White Plains on December 8, 2016, before the interview with Dollard took place.

187.   According to the HR Investigation Report, Dollard also asserted that he "did not recall ever staying at a hotel in White Plains." *See* Exhibit B.

188.   According to the HR Investigation Report, a member of Plaintiff's carpool had confirmed that their carpool had once dropped Dollard off at a hotel.  *See* Exhibit B.

189.   Despite having contradictory evidence from Plaintiff and another Canon employee about Dollard's hotel stay, Canon's Human Resources representatives do not appear to have taken these contradictory facts into account in assessing Plaintiff's veracity.

190.    Similarly, on January 12, 2017, according to the HR Investigation Report, Dollard denied staying at the Wentworth Hotel in New Hampshire, which Plaintiff had asserted they stayed in together.  *See* Exhibit B.

191.    Dollard claimed that he had "'gifted' Marriot hotel points to [Plaintiff] so that she could stay at the Wentworth . . . ," according to the HR Investigation Report. *See* Exhibit B.

192.    On December 8, 2016, prior to HR's interview of Dollard, Plaintiff had provided Canon with a receipt for $308.46, for a one-night a stay at the Wentworth.

193.    The value of Plaintiff's receipt for the Wentworth and her assertion that Dollard had not provided her with points contradicts Dollard's claim that he had "gifted" her points to stay there for the evening, but it seems Canon did not follow up with Dollard to get any further explanation.

194.    Canon apparently determined that Plaintiff and Dollard may have had a consensual relationship, although Canon adduced no evidence to reflect that there was a consensual relationship, other than Canon's seeming belief that Plaintiff is a liar.

195.    On or about November 21, 2016, Plaintiff provided HR with a sworn statement containing multiple allegations of unwelcome and unwanted sexual advances by Dollard.

196.    On February 2, 2017, Plaintiff confirmed her claims of unwelcome and unwanted sexual advances by Dollard in an interview with HR.

197.    Plaintiff received six months of short term disability payments, the full amount allowed under the Canon insurance policy, based on her diagnosis of depression and post-traumatic stress disorder stemming from Dollard's abuse.

198.    Plaintiff provided to Canon unsolicited text messages which she received from Dollard, including inappropriate and sexually explicit comments, to which she did not respond in kind.

199.    According to the HR Investigation Report, Dollard completely denied having any sexual relationship with Plaintiff.  *See* Exhibit B.

200.    Despite Dollard's denial that there was a sexual relationship between him and Plaintiff, and Plaintiff's claims of sexual harassment, the HR Investigation Report, concluded, "[t]here is no evidence to support the allegation that any relationship was forced upon her [Plaintiff].  The evidence suggests that perhaps there was a consensual relationship between these individuals however even this type of relationship cannot be conclusively determined."  *See* Exhibit B.

201.    The method applied and conclusions reached in the HR Investigation Report, support Plaintiff's reasonable concerns about bringing her claims of sexual harassment to HR.  *See* Exhibit B.

202.    Plaintiff's questioning by Human Resources was hostile.

203.    Plaintiff felt as though Canon went on a campaign to blame her, the victim of unwanted and sexual touching, threats, and comments, and that her complaints were effectively marginalized and disregarded by Canon.

204.    Plaintiff felt that Human Resources was working to protect Dollard and discredit her complaint and the emotional harm she has suffered.  Those feelings were confirmed when Plaintiff read Canon's HR Investigation Report.  *See* Exhibit B.

205.    The interview with Human Resources led Plaintiff to suffer additional emotional distress.

206.    According to the HR Investigation Report, Canon questioned Dollard about the inappropriate text messages on February 14, 2017.  *See* Exhibit B.

207.     According to the HR Investigation Report, Canon chose to fire Dollard due to the inappropriate nature of the text messages, stating: "[t]his conduct alone is in violation of Canon's policies."  *See* Exhibit B.

208.     Canon was aware that Plaintiff was receiving short term disability payments until they were exhausted on or about April 21, 2017.

209.     Canon never engaged in the interactive process with Plaintiff to determine what reasonable accommodations, if any, were appropriate for her to return to work.

210.     On February 28, 2017, more than three months after making her complaint, Plaintiff received what appears to be a standard form letter from Canon stating that Dollard no longer worked there, and Plaintiff could return to work, if her doctor cleared her.

211.     The February 28, 2017 letter stated that if Plaintiff returned to work, she would begin reporting to Barbera, a male employee who had been her colleague when she left Canon on medical leave.

212.     Upon information and belief, Barbera had taken over Dollard's position, which Dollard had told Plaintiff he was trying to secure for her when he was moved to another position.

213.     It appears that Dollard was fired on or about February 27, 2017, almost two weeks after Canon determined that he sent Plaintiff inappropriate text messages with sexual content, without providing any notice to Plaintiff so she could be prepared for any contact Dollard might attempt to make toward her.

214.     On February 28, 2017, before receiving the letter from Canon, Plaintiff received a phone call from Dollard on her cell phone.  Terrified, she did not answer the phone.

215.    This pro forma invitation to return to work was disingenuous and Canon could not have reasonably expected Plaintiff to accept it after she was sexually harassed by her supervisor for almost a year and a half.

216.    Although Dollard was fired, it does not appear to have had a negative impact on his career.  He is currently the director of the Commercial & Industrial Printing Group at Ricoh USA, and is featured in an online video on piworld.com discussing why he joined Ricoh.

217.    In the online interview about what led him to join Ricoh, (http://www.piworld.com/xchange/digital-printing/brian-dollard-on-what-led-him-to-ricoh-and-the-future-of-the-industry/), Dollard states that Ricoh "is a company that is poised to grow, committed to investing in the organization, and that's not where I see a lot of companies in the industry going right now, and that was really attractive to me. So when the opportunity presented itself, it was a surprisingly easy decision to make."

218.    According to a letter from Canon dated April 6, 2017, Plaintiff was "invited" to apply for open positions at Canon if she received medical clearance.  Her position was no longer guaranteed because her Family and Medical Leave Act leave had ended.

219.    Canon's Human Resources investigation exacerbated the toxic atmosphere at the company by providing her colleagues with information that should have been kept confidential, while Plaintiff was offered no assurances that Canon would take meaningful steps to remedy the hostile work environment at the company, particularly in light of Canon's retaliation against Plaintiff for reporting her sexual harassment.

220.    Plaintiff was constructively discharged from her position due to the sexual harassment she suffered, HR's badgering questioning, HR not sharing the details of their investigation, HR not offering to meet with her to reintegrate her into the

workplace, Canon having promoted a male colleague to supervise her, and HR's failure

to engage in the interactive process to provide any reasonable accommodations for her

disability to facilitate her return to work, all of which made Canon's offer to return to

work disingenuous.

**FIRST CLAIM**
**(Gender Discrimination in Violation of Title VII)**

221.    Plaintiff hereby repeats and realleges each allegation contained in

paragraphs 1 through 220 as if fully set forth herein.

222.    Defendant is an "employer" within the meaning of Title VII.

223.    Plaintiff is an "employee" within the meaning of Title VII.

224.    Plaintiff was qualified to hold her position of employment with Canon

and had satisfactorily performed the duties required by her position of employment

with Canon.

225.    Pursuant to the unlawful acts and practices of Canon's agent as alleged

above, Plaintiff was mistreated in her employment due to her sex.

226.    Canon knew or should have known of the unlawful acts and practices as

alleged above, yet failed to act promptly to prevent or end the harassment and

discrimination.

227.    Canon's investigation of Plaintiff's claims was inherently gender biased.

228.    Canon's investigation of Plaintiff's claims unreasonably suggested to

Plaintiff's colleagues that she had been in a physical relationship with Dollard, implying

Plaintiff's consent when she suffered unwanted and unwelcome conduct.

229.    Canon has discriminated against Plaintiff on the basis of her sex in

violation of Title VII by denying her equal terms and conditions of employment,

including but not limited to, denying her the opportunity to work in an employment setting free of unlawful discrimination.

230.    As a direct and proximate result of Canon's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer monetary and/or economic harm, including but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of damages.

231.    As a result of Canon's discriminatory acts, Plaintiff has suffered and will continue to suffer substantial losses, including loss of past and future earnings and has suffered other monetary damages and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation.

## SECOND CLAIM
### (*Quid Pro Quo* Sexual Harassment in Violation of Title VII)

232.    Plaintiff hereby repeats and realleges each allegation contained in paragraphs 1 through 231 as if fully set forth herein.

233.    Canon is an "employer" within the meaning of Title VII.

234.    Plaintiff is an "employee" within the meaning of Title VII.

235.    Because Plaintiff is a woman, she is a member of a protected group under Title VII.

236.    Plaintiff was subjected to unwelcome sexual harassment by Dollard with the implication that unless she submitted to his sexual demands, her opportunities at Canon would be limited.

237.    Plaintiff was subjected to *quid pro quo* sexual harassment, as her supervisor explicitly used his authority to offer to help her get another position, and subsequently to promote her, as a reason for her to submit to his sexual advances.

238.    Dollard began his sexual harassment of Plaintiff after she informed him that she was applying for a position at Océ, which he claimed to be able to help her attain.

239.    Dollard continued and increased his harassment of Plaintiff after he was able to "make her a manager again," in January 2016, demonstrating his total control over Plaintiff's position at Canon.

240.    The harassment Plaintiff complains of was based upon her gender.

241.    Plaintiff was subjected to this harassment because the harasser was her direct supervisor who controlled her compensation, along with the other terms, conditions and privileges of her employment.

242.    Canon is liable for the actions of Dollard because he was a Director, and Plaintiff's supervisor at all relevant times.

243.    As a direct and proximate result of Canon's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer monetary and/or economic harm, including but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of damages.

244.    As a result of Canon's discriminatory acts, Plaintiff has suffered and will continue to suffer substantial losses, including loss of past and future earnings and has suffered other monetary damages and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation.

**THIRD CLAIM**
**(Hostile Work Environment in Violation of Title VII)**

245.    Plaintiff hereby repeats and realleges each allegation contained in paragraphs 1 through 244 as if fully set forth herein.

246.    Canon is an "employer" within the meaning of Title VII.

35

247.    Plaintiff is an "employee" within the meaning of Title VII.

248.    Canon subjected Plaintiff to a hostile work environment based on her sex. The hostile environment included sexual comments, sexual advances, and coerced sexual conduct.  This conduct was unwanted and unwelcome.

249.    A reasonable person would have considered the conduct to be significant and not trivial or petty.  Plaintiff actually considered the conduct to be severe and pervasive.

250.    Canon enabled and maintained a sexually hostile work environment.

251.    In the exercise of reasonable care, Defendant should have known of Dollard's conduct and failed to exercise reasonable diligence to prevent such conduct.

252.    Canon lacks a meaningful and responsive procedure for investigating complaints of discriminatory practices by employees, and for taking appropriate action against those persons who are found to have engaged in such practices.

253.    Canon fails to effectively communicate a company policy against sexual harassment to employees and agents.

254.    Canon lacks a program to educate employees and agents about unlawful discriminatory practices under local, state, and federal laws.

255.    Canon lacks procedures for the supervision of employees and agents specifically directed at the prevention and detection of such practices.

256.    As a direct and proximate result of Canon's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer monetary and/or economic harm, including but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of damages.

257.    As a result of Canon's discriminatory acts, Plaintiff has suffered and will continue to suffer substantial losses, including loss of past and future earnings and has

suffered other monetary damages and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation.

### FOURTH CLAIM
### (Retaliation in Violation of Title VII)

258.    Plaintiff hereby repeats and realleges each allegation contained in paragraphs 1 through 257 as if fully set forth herein.

259.    Canon is an "employer" within the meaning of Title VII.

260.    Plaintiff is an "employee" within the meaning of Title VII.

261.    Plaintiff engaged in an activity protected under federal law, that is making a complaint of sexual harassment.

262.    Canon subjected Plaintiff to an adverse employment action, including having her return to a position where she would report to someone who had previously been her equal, after failing to consider her for promotion to said position, which was vacated by her harasser while she was on medical leave.

263.    Plaintiff was qualified for that position, a job that Dollard had promised to her.

264.    Canon subjected Plaintiff to an adverse employment action by not engaging in the interactive process to find a reasonable accommodation to allow her to return to work.

265.    Canon subjected Plaintiff to an adverse employment action by not paying her bonus for 2016 while she was out on leave due to the actions of her supervisor.

266.    Canon subjected Plaintiff to an adverse employment action by aggressively asking her why she had not said "no" more times to her harasser, and implying both that she had not taken enough action to stand up to her harasser, and that the offensive text messages she received were proof that she could say "no."

267.     Canon subjected Plaintiff to an adverse employment action by crediting her harasser's claims over her own, despite having evidence to the contrary.

268.     Canon subjected Plaintiff to an adverse employment action by not promptly and thoroughly investigating her claims of harassment.

269.     Canon subjected Plaintiff to an adverse employment action by implying to seven colleagues of Plaintiff, including three who were ranked above her, that Plaintiff had been in a physical relationship with Dollard, according to the HR Investigation Report.  *See* Exhibit B.

270.     Canon subjected Plaintiff to an adverse employment action by describing her allegations of sexual harassment and assault as a "physical relationship" to Plaintiff's colleagues and supervisors, implying Plaintiff's consent when she suffered unwelcome and unwanted sexual conduct from Dollard.

271.     Canon subjected Plaintiff to an adverse employment action by firing Dollard without providing Plaintiff with advance notice, offering her no protection from him, despite her justifiable fears about his vindictiveness.

272.     Canon subjected Plaintiff to an adverse employment action by not informing Plaintiff about how the investigation had been conducted, including who had been interviewed, leaving her to fear for her reputation at Canon, and within the small community of printing professionals she works with.

273.     These actions by Canon may dissuade a reasonable worker from making or supporting a charge of discrimination; they were the precise concerns that prevented Plaintiff from making a report of discrimination to HR before retaining legal counsel.

274.     As a direct and proximate result of Canon's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer monetary

and/or economic harm, including but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of damages.

275.    As a result of Canon's discriminatory acts, Plaintiff has suffered and will continue to suffer substantial losses, including loss of past and future earnings and has suffered other monetary damages and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation.

276.    Canon has not demonstrated any improvement in their hostile work environment.

277.    Under the circumstances, Canon's offer for Plaintiff to return to work was a meaningless, empty gesture which Canon cannot legitimately believe could be accepted under the circumstances.

### FIFTH CLAIM
### (Gender Discrimination in Violation of New York State Human Rights Law)

278.    Plaintiff repeats and realleges paragraphs 1 through 277 of this complaint as if fully set forth herein.

279.    Canon is an "employer" within the meaning of the New York State Human Rights Law.

280.    Plaintiff is an "employee" within the meaning of the New York State Human Rights Law.

281.    Canon has discriminated against Plaintiff on the basis of her sex, in violation of the NYSHRL by denying her equal terms and conditions of employment, including but not limited to, denying her the opportunity to work in an employment setting free of unlawful discrimination.

282.    As a direct and proximate result of Canon's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer

monetary and/or economic harm, including but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of damages.

283.    As a result of Canon's discriminatory acts, Plaintiff has suffered and will continue to suffer substantial losses, including loss of past and future earnings and has suffered other monetary damages and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation.

**SIXTH CLAIM**
**(*Quid Pro Quo* Sexual Harassment in Violation of**
**New York State Human Rights Law)**

284.    Plaintiff repeats and realleges paragraphs 1 through 283 of this complaint as if fully set forth herein.

285.    Canon is an "employer" within the meaning of the New York State Human Rights Law.

286.    Plaintiff is an "employee" within the meaning of the New York State Human Rights Law.

287.    Plaintiff was subjected to unwelcome sexual harassment by Dollard with the implication that unless she submitted to his sexual demands, her opportunities at Canon would be limited.

288.    Plaintiff was subjected to *quid pro quo* sexual harassment, as her supervisor explicitly used his authority to offer to help her get another position, and subsequently to promote her, as a reason for her to submit to his sexual advances.

289.    Dollard began his sexual harassment after Plaintiff informed him that she was applying for a position at Océ, which he claimed to be able to help her attain.

290.    Dollard continued and increased his harassment of Plaintiff after he was able to "make her a manager again," in January 2016, after having overseen her demotion, demonstrating his control over her position.

291.    As a direct and proximate result of Canon's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer monetary and/or economic harm, including but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of damages.

292.    As a result of Canon's discriminatory acts, Plaintiff has suffered and will continue to suffer substantial losses, including loss of past and future earnings and has suffered other monetary damages and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation.

### SEVENTH CLAIM
### (Hostile Work Environment in Violation of
### New York State Human Rights Law)

293.    Plaintiff repeats and realleges paragraphs 1 through 292 of this complaint as if fully set forth herein.

294.    Canon is an "employer" within the meaning of the New York State Human Rights Law.

295.    Plaintiff is an "employee" within the meaning of the New York State Human Rights Law.

296.    Dollard created a hostile work environment with his continued and unwanted sexual advances, propositions, and other sexual comments.

297.    Canon created a hostile work environment by employing and promoting supervisors who made sexual advances to their employees.

298.    As a direct and proximate result of Canon's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer monetary and/or economic harm, including but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of damages.

299.    As a result of Canon's discriminatory acts, Plaintiff has suffered and will continue to suffer substantial losses, including loss of past and future earnings and has suffered other monetary damages and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation.

### EIGHTH CLAIM
### (Retaliation in Violation of New York State Human Rights Law)

300.    Plaintiff repeats and realleges paragraphs 1 through 299 of this complaint as if fully set forth herein.

301.    Canon is an "employer" within the meaning of the New York State Human Rights Law.

302.    Plaintiff is an "employee" within the meaning of the New York State Human Rights Law.

303.    Canon subjected Plaintiff to an adverse employment action, including having her return to a position where she would report to someone who had previously been her equal and not considering her for promotion to said position, which was vacated by her harasser while she was on medical leave.

304.    Canon subjected Plaintiff to an adverse employment action by not participating in the interactive process to help to find a reasonable accommodation to allow her to return to work.

305.    Canon subjected Plaintiff to an adverse employment action by not paying her bonus while she was out on leave due to the actions of her superviso**r.**

306.    Canon subjected Plaintiff to an adverse employment action by aggressively asking her why she had not said "no" more times to her harasser and implying both that she had not taken enough action to stand up to her harasser and that the offensive text messages she received from him were proof that she could say "no."

307.     Canon subjected Plaintiff to an adverse employment action by not telling Plaintiff what Canon's message to her harasser had been during the investigation, and at the point he separated from Canon, thereby failing to protect her from him and any post-separation vindictive behavior.

308.     Canon subjected Plaintiff to an adverse employment action by not informing Plaintiff how the investigation had been conducted, including who had been interviewed, leaving her to fear for her reputation at Canon and within the small community of printing professionals she works with.

309.     Canon subjected Plaintiff to an adverse employment action by alleging to Plaintiff's colleagues that she had been in a consensual physical relationship with Dollard.

310.     Canon subjected Plaintiff to an adverse employment action by classifying her allegations of sexual harassment and assault as a physical relationship to Plaintiff's colleagues and supervisors, implying Plaintiff's consent when she suffered unwanted and unwelcome conduct.

311.     These actions by Canon may dissuade a reasonable worker from making or supporting a charge of discrimination.  They were the precise concerns that prevented Plaintiff from making a charge of discrimination before retaining legal counsel.

312.     As a direct and proximate result of Canon's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer monetary and/or economic harm, including but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of damages.

313.     As a result of Canon's discriminatory acts, Plaintiff has suffered and will continue to suffer substantial losses, including loss of past and future earnings, and has

suffered other monetary damages and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation.

### NINTH CLAIM
### (Gender Discrimination in Violation of New York City Human Rights Law)

314.    Plaintiff repeats and realleges paragraphs 1 through 313 of this complaint as if fully set forth herein.

315.    Canon is an "employer" within the meaning of the New York City Human Rights Law.

316.    Plaintiff is an "employee" within the meaning of the New York City Human Rights Law.

317.    Plaintiff had occasional client meetings in New York City, and worked out of the New York City office at 125 Park Avenue, 9th and 10th Floor, New York, NY 10017, from time to time.

318.    During all relevant times to this claim, Dollard functioned in a managerial and supervisory capacity towards Plaintiff and had the power to alter the terms and conditions of Plaintiff's employment.

319.    Canon has discriminated against Plaintiff on the basis of her sex, in violation of the NYCHRL by denying her equal terms and conditions of employment, including but not limited to denying her the opportunity to work in an employment setting free of unlawful discrimination.

320.    Plaintiff's sex has been a determining factor in Canon's subjecting Plaintiff to discrimination in the terms, conditions, or privileges of employment.

321.    As a direct and proximate result of Canon's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer

monetary and/or economic harm, including but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of damages.

322.     As a result of Canon's discriminatory acts, Plaintiff has suffered and will continue to suffer substantial losses, including loss of past and future earnings and has suffered other monetary damages and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation.

323.     Canon's unlawful discriminatory actions and harassment constitute malicious, willful and wanton violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

**TENTH CLAIM**
**(*Quid Pro Quo* Harassment in Violation of New York**
**City Human Rights Law)**

324.     Plaintiff repeats and realleges paragraphs 1 through 323 of this complaint as if fully set forth herein.

325.     Canon is an "employer" within the meaning of the New York City Human Rights Law.

326.     Plaintiff is an "employee" within the meaning of the New York City Human Rights Law.

327.     Plaintiff had occasional client meetings in New York City, and worked out of the New York City office at 125 Park Avenue, 9th and 10th Floor, New York, NY 10017, from time to time.

328.     Plaintiff was subjected to unwelcome sexual harassment by Dollard with the implication that unless she submitted to his sexual demands, her opportunities at Canon would be limited.

329.    Plaintiff was subjected to *quid pro quo* sexual harassment, as her supervisor explicitly used his authority to offer to help her get another position, and subsequently to promote her, as a reason for her to submit to his sexual advances.

330.    Dollard began his sexual harassment after Plaintiff informed him that she was applying for a position at Océ, which he claimed to be able to help her attain.

331.    Dollard continued and increased his harassment of Plaintiff after he was able to "make her a manager again," in January 2016, demonstrating his control over her position.

332.    As a result of Canon's discriminatory acts, Plaintiff has suffered and will continue to suffer substantial losses, including loss of past and future earnings and has suffered other monetary damages and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation.

333.    Canon's unlawful discriminatory actions and harassment constitute malicious, willful and wanton violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

### ELEVENTH CLAIM
### (Hostile Work Environment in Violation of New York City Human Rights Law)

334.    Plaintiff repeats and realleges paragraphs 1 through 333 of this complaint as if fully set forth herein.

335.    Canon is an "employer" within the meaning of the New York City Human Rights Law.

336.    Plaintiff is an "employee" within the meaning of the New York City Human Rights Law.

337.    Plaintiff had regular client meetings in New York City.

338.    During all relevant times to this claim, Dollard functioned in a managerial and supervisory capacity towards Plaintiff and had the power to alter the terms and conditions of Plaintiff's employment.

339.    Dollard created a hostile work environment with his continued and unwanted sexual advances, propositions and other sexual comments.

340.    Canon created a hostile work environment by classifying Plaintiff's allegations of sexual harassment and assault as a physical relationship to Plaintiff's colleagues and supervisors, implying Plaintiff's consent when she suffered unwanted and unwelcome conduct.

341.    As a result of Canon's discriminatory acts, Plaintiff has suffered and will continue to suffer substantial losses, including loss of past and future earnings and has suffered other monetary damages and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation.

342.    Canon's unlawful discriminatory actions and harassment constitute malicious, willful and wanton violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

## TWELFTH CLAIM
### (Constructive Discharge in Violation of Title VII)

343.    Plaintiff repeats and realleges paragraphs 1 through 342 of this complaint as if fully set forth herein.

344.    Canon is an "employer" within the meaning of Title VII.

345.    Plaintiff is an "employee" within the meaning of Title VII.

346.    Plaintiff reported her sexual harassment to Canon, which performed a slow, inadequate, and retaliatory investigation into Plaintiff's claims, and failed to take appropriate steps to address her complaint.

347.    Canon informed Plaintiff's colleagues that she had been in a physical relationship with the man she identified as her harasser.

348.    Canon wrongly determined that Plaintiff and Dollard may have had a consensual relationship through the purported HR investigation, although there is no evidence to reflect that there was a consensual relationship between them other than Canon's mistaken belief that Plaintiff is a liar, demonstrating to Plaintiff that her employer did not take her claims of sexual harassment seriously.

349.    Canon's pro forma letter of February 28, 2017, inviting Plaintiff to return to work and their follow up letter of April 6, 2017, were indicative of Canon's failure to adequately address a hostile work environment and *quid pro quo* sexual harassment to which Plaintiff had been subjected and offered her no indication that appropriate accommodations would be made for her emotional distress if she were to return.

350.    Canon did not protect Plaintiff from her harasser, informing her by mail that the HR investigation was over, a letter received by her after the harasser called Plaintiff on her cell phone.

351.    Plaintiff could not continue to work in a hostile workplace, and had no choice but to stop working at Canon.

352.    A reasonable person would not be able to remain at work in an environment where they were being sexually harassed, and the employer conducted an ineffectual HR investigation which included telling colleagues of an alleged physical relationship with the harasser, demonstrating that the employer did not believe that any harassment had occurred, and did not attempt to reasonably accommodate the victim of harassment when offering her an opportunity to return to work.

**THIRTEENTH CLAIM**
**(Constructive Discharge in Violation of New York State Human Rights Law*)***

353.    Plaintiff repeats and realleges paragraphs 1 through 352 of this complaint as if fully set forth herein.

354.    Canon is an "employer" within the meaning of the New York State Human Rights Law.

355.    Plaintiff is an "employee" within the meaning of the New York State Human Rights Law.

356.    Plaintiff reported her sexual harassment to Canon, which performed a slow, inadequate, and retaliatory investigation into Plaintiff's claims, and failed to take appropriate steps to address her complaint.

357.    Canon informed Plaintiff's colleagues that she had been in a physical relationship with the man she identified as her harasser.

358.    Canon wrongly determined that Plaintiff and Dollard may have had a consensual relationship through the purported HR investigation, although there is no evidence to reflect that there was a consensual relationship between them other than Canon's mistaken belief that Plaintiff is a liar, demonstrating to Plaintiff that her employer did not take her claims of sexual harassment seriously.

359.    Canon's pro forma letter of February 28, 2017, inviting Plaintiff to return to work and their follow up letter of April 6, 2017, were indicative of Canon's failure to adequately address a hostile work environment and *quid pro quo* sexual harassment to which Plaintiff had been subjected and offered her no indication that appropriate accommodations would be made for her emotional distress if she were to return.

360.    Canon did not protect Plaintiff from her harasser, informing her by mail that the HR investigation was over, a letter received by her after the harasser called Plaintiff on her cell phone.

361.    Plaintiff could not continue to work in a hostile workplace, and had no choice but to stop working at Canon.

362.    A reasonable person would not be able to remain at work in an environment where they were being sexually harassed, and the employer conducted an ineffectual HR investigation which included telling colleagues of an alleged physical relationship with the harasser, demonstrating that the employer did not believe that any harassment had occurred, and did not attempt to reasonably accommodate the victim of harassment when offering her an opportunity to return to work.

**FOURTEENTH CLAIM**
**(Constructive Discharge in Violation Of New York City Human Rights Law)**

363.    Plaintiff repeats and realleges paragraphs 1 through 362 of this complaint as if fully set forth herein.

364.    Canon is an "employer" within the meaning of the New York City Human Rights Law.

365.    Plaintiff is an "employee" within the meaning of the New York City Human Rights Law.

366.    Plaintiff reported her sexual harassment to Canon, which performed a slow, inadequate, and retaliatory investigation into Plaintiff's claims, and failed to take appropriate steps to address her complaint.

367.    Canon informed Plaintiff's colleagues that she had been in a physical relationship with the man she identified as her harasser.

50

368.    Canon wrongly determined that Plaintiff and Dollard may have had a consensual relationship through the purported HR investigation, although there is no evidence to reflect that there was a consensual relationship between them other than Canon's mistaken belief that Plaintiff is a liar, demonstrating to Plaintiff that her employer did not take her claims of sexual harassment seriously.

369.    Canon did not offer Plaintiff any reasonable accommodations when she was invited to return to work, despite being aware that she was receiving short term disability payments.

370.    Canon did not protect Plaintiff from her harasser, informing her by mail that the HR investigation was over, a letter received by her after the harasser called Plaintiff on her cell phone.

371.    Plaintiff could not continue to work in a hostile workplace, and had no choice but to stop working at Canon.

372.    A reasonable person would not be able to remain at work in an environment where they were being sexually harassed, and the employer conducted an ineffectual HR investigation which included telling colleagues of an alleged physical relationship with the harasser, demonstrating that the employer did not believe that any harassment had occurred, and did not attempt to reasonably accommodate the victim of harassment when offering her an opportunity to return to work.

**PRAYER FOR RELIEF ON CLAIMS**

WHEREFORE, Plaintiff prays that this Court:

a.  Declare the acts and practices complained of herein violate Title VII of the Civil Rights Act of 1964, New York State Human Rights Law, and New York City Human Rights Law.

b. Award Plaintiff all of her damages under Title VII of the Civil Rights Act of 1964, New York State Human Rights Law, and New York City Human Rights Law, including back pay, front pay, compensatory damages, and punitive damages in an amount to be determined at trial.

c. Award Plaintiff all attorneys' fees, costs, and expenses available under law.

d. Award Plaintiff all pre-judgment interest and post-judgment interest available under law.

e. Award Plaintiff such additional and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues triable of right by jury.

Dated: New York, New York
        March 20, 2018

BERKE-WEISS LAW PLLC

By: _____

Laurie Berke-Weiss
Alexandra Berke
Rosa Aliberti
950 Third Avenue, 32nd Floor
New York, NY 10022
Telephone: (212) 888-2680
laurie@berkeweisslaw.com
alex@berkeweisslaw.com
rosa@berkeweisslaw.com

*Attorneys for Plaintiff*